Horne v. Curtis.

---

No. 22,130.

L. O. HORNE, *Appellee*, v. C. P. CURTIS and GRANT DUVALL, *Appellants*.

SYLLABUS BY THE COURT.

1. FRAUDULENT REPRESENTATIONS — *Damages* — *Statute of Limitations*. An action for damages on account of fraudulent misrepresentations is barred in two years.

2. SAME—*When Statute of Limitations Begins to Run*. The time for the bringing of an action for damages on account of fraudulent misrepresentations begins to run when the facts concerning the fraud are discovered.

3. SAME—*Action Barred After Two Years*. The facts examined, and, assuming that they disclose fraud, the plaintiff was sufficiently apprised of them to have based his action thereon more than two years before it was begun, and consequently his action was barred by the statute of limitations. (Civ. Code, § 17, subdiv. 3.)

Appeal from Wallace district court; JACOB C. RUPPENTHAL, judge. Opinion filed October 11, 1919. Reversed.

*Lee Monroe, James A. McClure,* and *C. M. Monroe,* all of Topeka, for the appellants.

No appearance was made for the appellee.

The opinion of the court was delivered by

DAWSON, J.: The plaintiff brought this action against the defendants for damages on account of alleged fraudulent misrepresentations whereby he was induced to part with a quarter section of Wallace county land worth from $500 to $700. The consideration was an assignment of a bill of sale for fifty head of horses running at large in the forests and mountains of Coconino county, Arizona. The title to the horses was in the defendant Curtis, by successive assignments of this bill of sale. Curtis acquired the bill of sale (for one hundred head of horses) in exchange for 320 acres of Colorado land worth $1,000, and $200 in cash. Curtis had never seen the horses. By private arrangement between Curtis and the defendant Duvall, Curtis permitted Duvall to trade the horses to plaintiff, Duvall giving Curtis a tract of land near Weskan, while plaintiff conveyed his land to Duvall.

Following this deal the trio went to Flagstaff, Ariz., in January, 1914, to capture the horses.

The plaintiff, in part, testified:

(Duvall) "said that he had never been there and had never seen the horses. . . . He said that he got fifty and wanted me to get the other fifty.

"Q. Now, did he say that he had fifty or that the other fellow had fifty of them? A. Well, now, the way I understood it was that he had fifty. These other fifty, he wanted me to get them so as we could both go gather them.

. . . . . . . . . . .

"Q. Well, when the three of you went down there together, you knew at that time that Grant [Duvall] did n't hold any horses himself? A. Why, he said he did n't—I did n't suppose he did.

. . . . . . . . . . .

"The people told us it would cost more than it was worth to get the horses. The Recorder [a public officer] said the horses were there, that some parties had been sold horses with these brands a while before and had rounded up two carloads. He said they had got what their contracts called for. He did n't seem to think they were worth any more than it cost to get them. The man Black we talked to was called Bum Black, he was born and raised there, and from his conversation he led me to believe that he knew about as much as anybody about it. Flagstaff is right in the mountains, and the pine trees are tolerably thick all over that country. . . . It was snowing at the time, the snow was from 15 to 18 inches deep. . . . The fellows could n't have done any-

thing towards gathering horses then. · It would be a big job to gather
them. . . . . They all told me at the time the best thing was to drop
it. Black said that there were horses there, and that a man might
gather up a few more than a hundred, but not many. He said it would
be mighty hard to get them. . . . At the time we made the deal
Duvall said he really didn't know whether these horses were there or
not, he hadn't been there. He said it might be rabbit tracks for all he
knew, but he gave me the impression that he got 50 head of them.

"Q. Well, now, you wouldn't say that he absolutely told you that he
had fifty of them? A. Well, I couldn't say that he absolutely told me
that, but he told me something that he caused me to think he had them.
Now, I don't just remember how he put it. ·

"Q. From his conversation you got the impression that he had 50
head? A. Yes, sir.

. "Q. But he didn't tell you that? A. I couldn't say whether he told
me right plain out that he had them, but he gave me that impression.

"Q. You don't undertake to say that he intentionally made you be-
lieve that he had them? A. Well, I don't know whether he intentionally
made me believe it or not, but he made me believe it. Now, he said I
was going with him to get them, that he was going to get them all,
I supposed the other fifty was his."

The jury's general verdict was in favor of plaintiff; and
fourteen special questions were answered, some of which will
not require consideration:

"2. Did Grant Duvall make any false and fraudulent representations
to the plaintiff at the time of making the trade? Ans. Yes. ·

"3. If you answer No. 2 'yes,' state what such representations were.
Ans. That he owned fifty head of said horses.

"4. If you answer No. 2 'yes,' were such representations made for the
purpose of inducing plaintiff to make the trade? Ans. Yes.

.     .     .     .     .     .     .     .     .     .     .     .

"7. If you answer No. 2 'yes,' did Grant Duvall know that such repre-
sentations were false? Ans. Yes.".

Defendant urges several errors, the first being that the
evidence wholly failed to prove that Duvall had made any
false or fraudulent misrepresentations. Passing that question
for the moment, the fraud found by the jury was Duvall's
representation that he owned fifty head of the horses. (Find-
ing 3.) Assuming that this finding discloses fraud, the plain-
tiff's own testimony was that about the time of making the
trade, and on the trip to Flagstaff, in January, 1914, Duvall
told plaintiff that he himself owned none of the horses. More-
over, the bill of sale received by plaintiff was signed "C. P.
Curtis by Grant Duvall, his agent." This action was begun

on August 29, 1917, some three years and seven months after the fraud, if any, was perpetrated. An abortive effort was attempted in the trial court to show that the fraud was not discovered until 1917. Plaintiff testified that he read something in 1917 which led him "to think that the horses were n't there." All the evidence was in harmonious agreement that the horses existed, but that it would cost more to catch them than they were worth. The plaintiff learned that fact in January, 1914.. If plaintiff ever had an action against these defendants, it should have been begun within two years after he was defrauded. (Civ. Code, § 17, subdiv. 3, Gen. Stat. 1915, § 6907.) While the statutory time to commence such an action does not begin to run until the fraud is discovered, plaintiff's case against defendants discloses the discovery of nothing of consequence which came to light after January, 1914.

The judgment is reversed, and the cause is remanded with instructions to enter judgment for defendants.